Filed 4/9/13  In re E.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | D062739 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12205D) |
| v. | |
| CARLOS C. et al., | |
| Defendants and Appellants; | |
| NICHOLAS C. et al., | |
| Appellants. | |


APPEALS from a judgment of the Superior Court of San Diego County, Carol

Isackson, Judge.  Affirmed.


In September 2012, the juvenile court terminated parental rights in the dependency

case of one-and-one-half-year-old E.C.  Father Carlos C., mother M.C. (together, the

parents) and E.C.'s older siblings (the siblings) appeal. All of the appellants contend the court erred by declining to apply the sibling relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v))[1] to termination of parental rights. Carlos additionally contends the court abused its discretion by denying his modification petition (§ 388), which requested that E.C. be placed with paternal uncle C.H. We affirm.

BACKGROUND

Before E.C. was born, the siblings became dependents of the juvenile court as a result of the parents' domestic violence and substance abuse. In July 2009, when the siblings ranged in age from nine to 13 years old, they were placed with C.H. C.H. allowed the parents frequent contact and overnight visits with the siblings. In February 2010, a social worker from the San Diego County Health and Human Services Agency (the Agency) told C.H. that the visits had to be supervised. C.H. became the siblings' guardian and the court terminated dependency jurisdiction in July. Before the court terminated jurisdiction, C.H. told the Agency that the siblings no longer had overnight weekend visits with the parents.

Although C.H. was aware of the parents' ongoing problems, including substance abuse and domestic violence, he continued to leave the siblings in the parents' care for extended periods. In July 2010, one of the siblings said he had recently stayed with the parents for a couple of days while C.H. went to Las Vegas. In August, two of the siblings reported C.H. was behaving differently, drinking more and leaving them alone more. In

---

1    All further statutory references are to the Welfare and Institutions Code.

2

September, C.H. acknowledged that the siblings had recently spent the night with the parents.

E.C. was born in December 2010. He suffered from opiate withdrawal and remained in the hospital for more than a month. While E.C. was still in the hospital, C.H. allowed the siblings to have an unsupervised weekend visit with the parents. During the weekend, M.C. drank alcohol to the point of intoxication, the parents argued and the police were summoned to the home. On January 14, 2011, the Agency held a meeting with concerned relatives. C.H. was invited but did not attend.

On January 19, 2011, the Agency filed a dependency petition for one-month-old E.C. The petition was based on E.C.'s drug withdrawal, M.C.'s substance abuse, the events during the siblings' recent weekend visit with the parents and the siblings' past dependency cases.

After being discharged from the hospital, E.C. was detained in a foster home. In February, the parents told the social worker they preferred that E.C. remain in the foster home rather than be moved to C.H.'s home. In March, the social worker asked C.H. if he was interested in visiting E.C. and if he wished to be considered for placement. C.H. said he wanted to visit. He said he could not care for E.C. at that time, although he did not want E.C. and the siblings to be separated. C.H. said that if the parents did not reunify,

he wished to be considered for placement at that point. C.H. said he would schedule an appointment to be fingerprinted, a prerequisite for visitation.[2]

In April 2011, the court entered true findings on the petition, ordered E.C. placed in foster care and ordered reunification services for the parents. In May, C.H. asked the social worker about the possibility of E.C. being placed with him. The social worker asked if C.H. was willing to be the relative caregiver and explained what that meant. C.H. said he would be willing to have E.C. placed in his home, but he needed to know ahead of time because it would be different than having school age children. Also in May, Carlos held a machete to the throat of the family cat while one of the siblings was having an unsupervised visit. During the ensuing child welfare investigation, C.H. delayed contact between the social worker and the siblings.

In August 2011, C.H. left a voice mail message for the social worker, stating that he had talked to Carlos and that E.C. should be in C.H.'s home. In September, C.H. refused to be fingerprinted, explaining that he had been cleared when the siblings were placed with him. The social worker told C.H. he would have to be fingerprinted again in order to be considered for E.C.'s placement. In November, M.C. reported that C.H. was drunk and had locked the siblings out of the home.

By January 2012, E.C. had been in foster care for approximately one year. During that time, except for C.H.'s inquiries, no relatives had come forward who were appropriate for placement and who had expressed an interest in placement and a

---

[2]    There is no indication in the record that C.H. ever arranged to be fingerprinted in 2011.

willingness to submit to a background check. On January 4, at the six-month review hearing, the court terminated reunification services and set a section 366.26 hearing. Because no relatives were available for placement, that day E.C. was placed in a concurrent planning foster home. E.C. remained in the foster home for the rest of the case, and his foster mother became his de facto parent.

On January 25, 2012, the social worker asked C.H. for assistance in notifying Carlos of the section 366.26 hearing. C.H. asked why he had not been called regarding placement and said, "I need to step in. The baby should not be with strangers." On February 16, the social worker called C.H. to discuss relative placement. C.H. said "he would step in, if nobody else did." C.H. said that having E.C. "in his home would be a big change and that he would have to talk about it more with his fiancé[e]." On February 29, the social worker called C.H. again. C.H. said that no one had contacted him about placement before E.C. was placed in foster care and "it would be best if [E.C.] was placed with relatives." The social worker said she would interview C.H. by telephone the next day to start the home evaluation process. On March 1, she interviewed him and submitted a request for a relative home assessment. On March 12, M.C. told the social worker she wanted E.C. placed with C.H.

In March 2012, the Agency's adoptions manager "denied" C.H.'s home evaluation, citing his criminal and child welfare history and his lack of judgment in allowing the siblings unsupervised contact with the parents. Between 1998 and 2003, C.H. was charged three times with driving under the influence. The first two cases were dismissed; the third charge, driving under the influence with bodily injury, resulted in a

5

misdemeanor conviction and a sentence of five days in jail and five years' probation. In November 2010, C.H.'s former girlfriend obtained a restraining order after receiving numerous threatening, abusive and nonsensical text messages from him. The restraining order is set to expire in November 2015.

On May 25, 2012, C.H. filed a grievance in response to the denial of his home evaluation. On June 29, an Agency director reversed the denial. On July 10, C.H. called the Agency and said he was willing to adopt E.C. On July 19, the social worker discussed with C.H. the Agency's concerns regarding his past decisions to allow the siblings frequent unsupervised contact with the parents despite his awareness of the parents' problems.

In August 2012, Carlos filed his section 388 petition. On September 24, the court denied the petition. On September 25, the court terminated parental rights.

CARLOS'S SECTION 388 PETITION

Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances exist and the proposed modification would promote the child's best interests.[3] (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) When a case is past the reunification phase, the focus is on the child's need for permanency and stability, and there is a rebuttable presumption that it is

---

[3]     In the instant case, the parties stipulated that the approval of C.H.'s home for placement constituted changed circumstances. The court accepted the stipulation. Thus, we address only the best interests aspect of section 388.

in the child's best interests to remain in the current placement.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

We review the denial of a section 388 petition for abuse of discretion.  (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)  Thus, we will not reverse unless the juvenile court's decision was " ' "arbitrary, capricious, or patently absurd" ' " (*In re Stephanie M*., *supra,* 7 Cal.4th at p. 318) and " 'exceeded the bounds of reason' " (*id.* at pp. 318-319). " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' "  (*Id.* at p. 319.) "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts."  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  We therefore accept the juvenile court's finding that the social worker was credible and C.H. was not.

At the time of the hearing, E.C. was nearly two years old and had lived with his foster mother for nearly nine months.  They had developed a strong bond.  E.C. viewed his foster mother as his parent.  He had trouble detaching from her to visit the siblings and was happy to see her at the close of visits.  The foster mother had addressed E.C.'s developmental issues and he was doing well.  She wished to adopt him and her home had been approved for adoption.[4]  The social worker believed it was in E.C.'s best interests to remain in the stable, loving home of his foster mother and that removal from the home "would be a traumatic experience for him."  As discussed more fully below, E.C.'s

---

[4]     C.H.'s home had not been approved for adoption.

relationship with the siblings was "not so important [as] to warrant pulling [him] from the stability he knows so that he can be with his siblings."

C.H. had not formed a relationship with E.C. Although C.H. was aware of this case from the beginning, he made little or no effort to establish a relationship until it became apparent that parental rights might be terminated. There is no documentation that he visited E.C. before June 2012. For more than a year after the commencement of the case, C.H.'s attitude toward placement ranged from indifference to ambivalence. Only after E.C. was placed in the concurrent planning foster home did C.H. express an unequivocal willingness to accept placement. Moreover, there were serious concerns about C.H.'s ability to protect E.C. on a long-term basis, arising in part from C.H.'s poor judgment in allowing the siblings to have unsupervised contact with the parents; drinking and driving; and engaging in behavior that resulted in the still extant restraining order. C.H. minimized those concerns.

The court did not abuse its discretion in denying Carlos's section 388 petition.[5]

## THE SIBLING RELATIONSHIP EXCEPTION

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to termination of parental rights when termination would substantially interfere with the child's sibling

---

[5] The Agency argues that the relative placement preference (§ 361.3) did not apply at the time of the section 388 hearing and asks this court to "provide much needed guidance regarding" when the preference applies. Carlos does not contend that C.H. was entitled to placement preference under section 361.3. Carlos merely asserts that section 361.3 is one component of a public policy favoring placement with relatives, and the policy was an additional factor showing that it was in E.C.'s best interests to be placed with C.H. On this record, we decline the Agency's request.

relationship and the severance of the relationship would be so detrimental to the child to outweigh the benefits of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-953; § 366.26, subd. (c)(1)(B)(v).) The juvenile court must "balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer." (*In re L.Y.L.*, at p. 951, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Factors to be considered include whether the children were raised in the same home; whether they shared significant common experiences or have existing close and strong bonds; and whether ongoing contact is in the child's best interests, including his or her long-term emotional interests, as compared to the benefits of adoption. (§ 366.26, subd. (c)(1)(B)(v).) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.) Examining the evidence in the light most favorable to the judgment, we conclude substantial evidence supports the finding the appellants did not meet their burden of proving the exception.[6] (*In re L.Y.L.,* at pp. 947, 952.)

E.C., who was not quite two years old at the time of the hearing, had never lived with the siblings. Other than visits, E.C. and the siblings did not have shared common experiences. E.C. was still getting to know the siblings and the relationship had not developed. The social worker believed E.C. did not have a strong bond with the siblings.

---

[6]    The parents and the siblings asserted the exception in juvenile court.

9

As discussed above, E.C. and his de facto parent did have a strong bond, and she wished to adopt him. The relative strength of E.C.'s bonds with the de facto parent and the siblings was evident at sibling visits. E.C. enjoyed the visits, but had no trouble separating from the siblings. E.C. had trouble separating from his de facto parent and was happy to see her when visits ended. Substantial evidence supports the finding that the benefits E.C. would derive from adoption outweighed any benefits he would derive from ongoing sibling contact.

The siblings contend the court's finding that E.C. did not share a close relationship with them was based on the court's mistaken belief that E.C. had only six hours of visits with the siblings over just a few months. The court stated: "If [C.H.] had [made an effort to build a relationship with E.C.], if there were a strong relationship with [C.H.] and the siblings, . . . the evidence might be different in this case. But it's not. There isn't a relationship there except for six hours of visits over the last few months." It appears that the court was referring to E.C.'s visits with C.H., not to E.C.'s visits with the siblings. E.C. had seven visits with C.H. from June to September 2012, and nine visits with some or all of the siblings during that period.[7] Even if the court's statement is ambiguous, however, this is of no assistance to the siblings. The fact remains that the appellants failed to meet their burden of showing that severance of the sibling relationship would be so detrimental to E.C. as to outweigh the benefits he would derive from adoption.

---

[7]     The extent of E.C.'s contact with the siblings before June 2012 is unclear. There were no sibling visits between January and June 2012.

10

Substantial evidence supports the conclusion that the sibling relationship exception did not apply.

## DISPOSITION

The judgment is affirmed.


HALLER, Acting P. J.

WE CONCUR:


McINTYRE, J.


AARON, J.

11